T.C. Memo. 1999-95


UNITED STATES TAX COURT


EDWARD A. AND AUDREY PRIMOZIC, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 26382-96, 4808-97,    Filed March 25, 1999.
            8042-98.


<u>Karin R. Dunlap</u>, for petitioners.

<u>Gregory S. Matson</u> and <u>Wendy L. Wojewodski</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  These consolidated cases involve income tax
deficiencies determined by respondent for petitioners' 1993
taxable year.  Respondent determined a $36,248 deficiency for

---

[1] Cases of the following petitioners are consolidated
herewith:  Thomas J. and Edith M. Primozic, docket No. 4808-97;
and Kenneth I. Primozic, docket No. 8042-98.

petitioners Edward M. and Audrey Primozic, docket No. 26382-96, a $23,352 deficiency for petitioners Thomas J. and Edith M. Primozic, docket No. 4808-97, and a $50,112 deficiency for petitioner Kenneth I. Primozic, docket No. 8042-98.  These cases were consolidated for trial, briefing, and opinion pursuant to Rule 141(a).[2]

The sole issue for our consideration is whether payments petitioners received from their former employer are excludable from income as damages received on account of personal injury or sickness under section 104(a)(2).

### FINDINGS OF FACT[3]

At the time their respective petitions were filed, petitioners Edward A. Primozic (Edward) and Audrey Primozic, husband and wife, resided in Gaithersburg, Maryland; petitioners Thomas J. Primozic (Thomas) and Edith M. Primozic, husband and wife, resided in Downer's Grove, Illinois; and petitioner Kenneth I. Primozic (Kenneth) resided in Orland Park, Illinois.  Audrey and Edith Primozic are petitioners in this case solely because they joined in filing Federal income tax returns with their

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year under consideration, and all Rule references are to this Court's Rules of Practice and Procedure.

[3] The stipulation of facts and the attached exhibits are incorporated herein by this reference.

husbands.  Subsequent references to "petitioners" refer only to Edward, Thomas, and Kenneth.

Petitioners were all longtime employees of International Business Machines Corp. (IBM).  Edward and Kenneth were asked by IBM executives to establish and run the customer business development (CBD) department in 1985.  The CBD department was intended to be an IBM in-house consulting group.  Although Edward was working for IBM in Bethesda, Maryland, and Kenneth was working for IBM in the Chicago, Illinois, area, they worked together on the CBD project.

Edward and Kenneth wrote a book entitled "Strategic Choices," which discussed the business management techniques that they were using in the CBD department.  Thomas, though not a part of the CBD department, helped Edward and Kenneth in the writing of "Strategic Choices".  Edward and Kenneth owned the rights to any royalties from "Strategic Choices".  IBM did not pay petitioners additional compensation for using the management techniques discussed in the book, and it did not receive royalties from the book.

In the course of their work with the CBD department, Edward and Kenneth became acquainted with high-level management of the National Association of Counties (NACO), a national association representing over 6,500 counties in the United States.  NACO was requesting bids from consulting firms to work with them on a

nationwide reinvention of local government projects for all of their member counties.  The CBD department of IBM prepared a bid that stressed the "Strategic Choices" management techniques.  IBM won the bid for the NACO contract.  NACO announced the NACO-IBM partnership at its national convention in July 1992.

On February 15, 1993, IBM announced to its employees that it planned to reduce the number of employees in IBM U.S. Marketing and Services Co. because of staffing dynamics and IBM's need to become more competitive and efficient.  On or about March 5, 1993, Edward and Kenneth were informed that their jobs as part of the CBD department had been designated "surplus" (chosen for permanent layoff).  As a result of this decision, Edward and Kenneth were unable to work on the NACO contract.  Thomas was not part of the CBD department, and his employment was unaffected by the decision to "surplus" the CBD department.

Beginning around March 24, 1993, Edward and Kenneth attempted to reverse IBM's decision to surplus the CBD department.  Thomas did not participate in the attempt.  Edward and Kenneth disagreed with the decision to surplus their department, arguing that it was a poor business decision that would be detrimental to IBM.  This effort was unsuccessful. Petitioners have never filed any legal action against IBM.

As part of IBM's employment reduction efforts, employees could request to participate in the IBM U.S. Marketing & Services

Co. Transition Plan (MSTP). The MSTP provided a lump-sum payment and IBM-funded health benefits that were more generous than the benefits received under IBM's regular severance program. IBM informed its employees that it would withhold appropriate Federal, State, and local taxes from MSTP lump-sum payments.

On June 30, 1993, Edward, Kenneth, and Thomas all agreed to participate in the MSTP program. In order to join the MSTP, the participants were required to sign a general release and covenant not to sue, releasing IBM from all liabilities that might exist, in contract, in tort, or any other type of claim, resulting from the employees' termination. The payments petitioners received were all calculated according to the MSTP formula, an amount equal to 1 week's pay for every 6 months of IBM service either fully or partially completed as of the date of separation. Edward, Kenneth, and Thomas received MSTP payments of $140,010, $147,171, and $83,352, respectively. Petitioners established their own consulting business, Strategic Choices, Ltd., following their departure from IBM.

On their 1993 income tax returns petitioners excluded from income the entire amounts of the MSTP payments received. In disclosure statements filed with their returns, petitioners asserted that the authority to exclude the payments from income was section 104(a)(2).

OPINION

The only issue for our consideration is whether the payments petitioners received for participating in the MSTP program are excludable from their income for 1993.  Section 61 includes in gross income all income from whatever source derived.  However, section 104(a)(2) provides that the amount of damages received (whether by suit or agreement) on account of personal injuries or sickness is not included in gross income.  The damages referred to are based upon tort or tort type rights.  See sec. 1.104-1(c), Income Tax Regs.

Petitioners argue that IBM's decision to surplus the CBD department, which prevented Edward and Kenneth from working on the NACO contract, injured their business reputations.[4] Therefore, petitioners conclude that the settlement proceeds were excludable as damages for personal injuries.[5]  In order for petitioners' section 104(a)(2) claim to prevail, they must show that IBM made the MSTP payments in order to settle petitioners' claims for personal injuries.  It is the payor's intent in making the payments, rather than whether or not the taxpayer actually suffered a personal injury, that is determinative for purposes of section 104(a)(2). See <u>Stocks v. Commissioner</u>, 98 T.C. 1, 10

---

[4] To the extent we do not address any of petitioners' other arguments, we find them to be without merit.

[5] Petitioners have failed to explain how Thomas, who was not even a part of the CBD department, was injured by IBM's decision to surplus the department.

(1992); Threlkeld v. Commissioner, 87 T.C. 1294, 1297 (1986), affd. 848 F.2d 81 (6th Cir. 1988).

Respondent argues that IBM did not make the payments at issue to petitioners as part of a settlement agreement on account of personal injuries. In addition, respondent argues that petitioners have not proven what part, if any, of the proceeds was for personal injuries, and that the settlement was in effect a severance payment.

Excludability under section 104(a)(2) is, to some extent, dependent on the origin of the claim asserted. See Thompson v. Commissioner, 89 T.C. 632 (1987), affd. 866 F.2d 709 (4th Cir. 1989); Threlkeld v. Commissioner, supra. Damage to an individual's business reputation can be a personal injury for purposes of section 104(a)(2). See Threlkeld v. Commissioner, supra at 1304-1305. The determination of the nature of a claim is factual. See Fabry v. Commissioner 111 T.C. 305 (1998); Stocks v. Commissioner, supra at 11.

Where damages are received pursuant to a settlement agreement, as here, the nature of the claim that was the basis for settlement controls whether such damages are excludable under section 104(a)(2). See United States v. Burke, 504 U.S. 229, 237 (1992). We have looked to the written terms of settlement agreements to determine the origin and allocation of settlement proceeds. See Metzger v. Commissioner, 88 T.C. 834 (1987), affd.

without published opinion 845 F.2d 1013 (3d Cir. 1988). The release in this case is essentially the same as that in Lubart v. Commissioner, T.C. Memo. 1997-343, affd. 154 F.3d 539 (5th Cir. 1998), and in Sodoma v. Commissioner, T.C. Memo. 1996-275. By its terms, petitioners released IBM from liability for both contract and tort claims. The release, however, does not specifically indicate that the lump-sum payments received by petitioners were paid to settle potential personal injury claims against IBM.

Where the settlement agreement lacks specific language stating what the settlement amount was paid to settle, then the most important factor is generally the intent of the payor. Respondent argues that petitioners' failure to lodge any formal or legal claim against IBM before and at the time of signing the release established that there was no bona fide dispute between petitioners and IBM that could provide the basis for settlement.

To prevail under section 104(a)(2), taxpayers are not required to assert a legal claim before the settlement or release. However, the absence of any knowledge of the claim by the employer-payor would negatively affect a taxpayer attempting to show the requisite intent underlying the payment. See Lubart v. Commissioner, supra. Here, Edward and Kenneth notified IBM executives of the initiation of their attempt to reverse the decision to surplus the CBD department. In the letter to the IBM

executives, petitioners stressed the importance of the CBD department but did not indicate that their business reputations had been injured or that they intended to assert a tort type claim against IBM. Petitioners have attempted to show that their business reputations were injured by IBM's actions. However, there is no evidence, other than petitioners' own testimony, which is not persuasive, that IBM made the MSTP payments to settle petitioners' personal injury claims.

We also note that the release form appears to be a standard document used by IBM for all of its employees who participate in the MSTP program. Moreover, the fact that the payments were based on time of service and rate of pay is more indicative of severance pay rather than a payment for personal injury. See Sodoma v. Commissioner, supra. Severance pay is taxable income. In sum, we find that the payments received by petitioners are not excludable from income.

To reflect the foregoing,

Decisions will be entered

for respondent.